**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| BRYAN MOTT, derivatively on behalf of NET POWER INC.,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL J. RICE, IV, AKASH PATEL, BRIAN ALLEN, RALPH ALEXANDER, PETER J. BENNETT, J. KYLE DERHAM, FREDERICK A. FORTHUBER, JOSEPH T. KELLIHER, CAROL PETERSON, BRAD POLLACK, EUNKYUNG SUNG, and ALEJANDRA VELTMANN,<br><br>Defendants,<br><br>and<br><br>NET POWER INC.,<br><br>Nominal Defendant. | Case No.:<br><br><br><br>**DEMAND FOR JURY TRIAL** |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Bryan Mott ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant NET Power Inc. ("NET Power" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Daniel J. Rice, IV ("Rice"), Akash Patel ("Patel"), Brian Allen ("Allen"), Ralph Alexander ("Alexander"), Peter J. Bennett ("Bennett"), J. Kyle Derham ("Derham"), Frederick A. Forthuber ("Forthuber"), Joseph T. Kelliher ("Kelliher"), Carol Peterson ("Peterson"), Brad Pollack ("Pollack"), Eunkyung Sung

("Sung"), and Alejandra Veltmann ("Veltmann") (collectively, the "Individual Defendants," and together with NET Power, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of NET Power, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Rice, Allen, and Patel for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NET Power, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative actions that seeks to remedy wrongdoing committed by the Individual Defendants from June 9, 2023 through March 7, 2025, both dates inclusive (the "Relevant Period").

2. NET Power is a clean energy technology company whose chief product is a novel power system (the "NET Power Cycle") which purportedly generates electricity through natural gas and simultaneously captures nearly all atmospheric emissions. The NET Power Cycle is

purportedly capable of functioning in a wide variety of altitudes, humidities, and temperatures, and is also capable of functioning as a net water producer.

3. The NET Power Cycle involves two main technologies: Oxy-combustion ("a clean heat generation process in which fuel is mixed with oxygen such that the resulting byproducts from combustion consist of only water and pure CO2") and Supercritical CO2 power cycle ("a closed or semi-closed loop process that replaces the air or steam used in most power cycles with recirculating CO2 at high pressure, as sCO2, producing power by expanding sCO2 continuously through a turbo expander").

4. NET Power purportedly plans to license this technology through the offer of plant designs, with potential customers including electric utilities, oil and gas companies, midstream oil and gas companies, technology companies, and industrial facilities, both in domestic and international markets. NET Power's three markets of focus are baseload generation, dispatchable generation and industrial applications.

5. Among NET Power's most notable current projects is the Company's first utility-scale plant known as "SN1" or "Project Permian." Project Permian is situated in the Permian Basin of West Texas.

6. Prior to the start of the Relevant Period, Defendants intimated that SN1 would be operational by 2026. The current cost estimate for Project Permian was approximately $950 million in 2023 and increased to $1.1 billion in 2024.

7. Throughout the Relevant Period, Defendants represented an anticipated completion date of the plant in 2026 and initial power generation between the second half of 2027 and the first half of 2028.

8. The commercial operations of the Company rely on the completion of Project Permian, as does the Company's financial status. Thus, investors and analysts have a particular stake in Defendants' projected timelines and cost estimates.

9. During the Relevant Period, the Individual Defendants made a series of false and misleading statements that led investors to believe that Project Permian would be completed at the cost and date represented by the Company. For example, the Company filed its quarterly report on Form 10-Q with the SEC on August 14, 2023 which noted that "the Company plans to . . . construct its first utility-scale plant [SN1] with targeted completion in 2026[.]"

10. The truth did not fully emerge until March 10, 2025, when the Company issued a press release noting that Project Permian's timeline and cost estimates were significantly larger than anticipated due chiefly to supply chain issues and site- and region- specific challenges.

11. On this news, the price of the Company's stock fell $2.18 per share, or approximately 31.46%, from a close of $6.93 per share on March 7, 2025 to close at $4.75 per share on March 10, 2025.

12. During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was unlikely to complete Project Permian on the timetable relayed to investors; (2) Project Permian would require substantially increased costs; (3) the timeline and estimated costs which the Company relayed to investors was unrealistic; and (4) the delays and further costs to Project Permian would result in substantial harm to the Company's

financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein, while, during the Relevant Period, one of the Individual Defendants sold Company shares at inflated prices for total proceeds of approximately $1,897,200.

16. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its former President and Chief Operating Officer ("COO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of North Carolina (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the former CFO's, the former President and COO's, and the Company's liability in the Securities Class Action,

their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of North Carolina or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23. Plaintiff is a current shareholder of NET Power. Plaintiff has continuously held NET Power stock at all relevant times.

### Nominal Defendant NET Power

24. NET Power is a Delaware corporation with its principle executive offices at 320 Roney St., Suite 200, Durham, North Carolina 27701. NET Power's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NPWR."

### Defendant Rice

25. Defendant Rice has served as a Company director and as the Company's CEO since June 2023.

26. The Schedule 14A the Company filed with the SEC on April 26, 2024 (the "2024 Proxy Statement") states the following about Defendant Rice:

> Mr. Rice has served as NET Power's Chief Executive Officer since June 2023. Mr. Rice has over 15 years of experience in the energy industry. Mr. Rice is a Partner of Rice Investment Group and served as Chief Executive Officer of Rice Energy Inc. ("Rice Energy") from October 2013 through the completion of its acquisition by EQT in November 2017. Prior to his role as Chief Executive Officer of Rice Energy, Mr. Rice served as Chief Operating Officer of Rice Energy from October 2012 through September 2013 and as Vice President and Chief Financial Officer of Rice Energy from October 2008 through September 2012. Mr. Rice oversaw Rice Energy's growth from start-up through its $1 billion initial public offering in 2014 and eventual $8.2 billion sale to EQT in 2017. Mr. Rice also oversaw the creation and growth of Rice Midstream Partners LP ("Rice Midstream"), which was acquired by EQT Midstream Partners, LP for $2.4 billion in 2018. Mr. Rice established Rice Energy's strategic framework for value creation, which yielded success for its shareholders and employees. He has utilized his operating and growth strategy formulation experience as the founder of Rice Energy to help portfolio companies of Rice Investment Group to refine and optimize their business strategies in order to profitably grow. Prior to joining Rice Energy, he was an investment banker for Tudor Pickering Holt & Co. in Houston and held finance and strategic roles with Transocean Ltd. and Tyco International plc. Mr. Rice is currently a director of EQT. Mr. Rice was previously a director of Archaea Energy

> Inc. from September 2021 until December 2022 when Archaea Energy Inc. was acquired by BP Products North America Inc. and was previously a director of Whiting Petroleum Corporation from September 2020 until July 2022 when Whiting Petroleum Corporation combined with Oasis Petroleum Inc. to form Chord Energy Corporation.

**Defendant Alexander**

27. Defendant Alexander has served as a Company director since June 2023 and also serves as Chairman of the Compensation Committee and as a member of the Audit Committee.

28. The 2024 Proxy Statement states the following about Defendant Alexander:

> Mr. Alexander served as Chief Executive Officer of Talen Energy Corporation, one of the largest competitive power generation and infrastructure companies in North America, from December 2016 to June 2021 and as its Chairman from June 2021 to April 2023. In December 2022, Talen Energy Corporation filed for Chapter 11 bankruptcy protection and consummated the strategic transactions contemplated by its Chapter 11 plan of reorganization and completed its restructuring in May 2023. Mr. Alexander was previously affiliated with Riverstone Holdings LLC, an energy and power-focused private equity firm, from 2007 to 2016. Prior to that, for nearly 25 years, he served in various positions with subsidiaries and affiliates of BP plc, one of the world's largest oil and gas companies ("BP"). From 2004 until 2006, Mr. Alexander served as Chief Executive Officer of Innovene, BP's $20 billion olefins and derivatives subsidiary. From 2001 until 2004, he served as Chief Executive Officer of BP's Gas, Power and Renewables and Solar segment and was a member of the BP group executive committee. Prior to that, Mr. Alexander served as a Group Vice President in BP's Exploration and Production segment and BP's Refinery and Marketing segment. He held responsibilities for various regions of the world, including North America, Russia, the Caspian, Africa and Latin America. Prior to these positions, Mr. Alexander held various positions in the upstream, downstream, and finance groups of BP. Since its inception in 2013, he has served on the Board of Directors of Enviva Inc. (NYSE: EVA), a global energy company specializing in sustainable wood bioenergy and one of the world's largest producers of sustainable wood pellets, which provide a low-carbon alternative to fossil fuels. He previously served on the boards of EP Energy Corporation, Foster Wheeler, Stein Mart, Inc., Amyris and Anglo-American plc. Mr. Alexander holds an M.S. in Nuclear Engineering from Brooklyn Polytech (now NYU School of Engineering) and an M.S. in Management Science from Stanford University.

**Defendant Allen**

29. Defendant Allen served as President and COO of the Company from April 2022 to May 1, 2025.

**Defendant Bennett**

30. Defendant Bennett has served as a Company director since June 2023 and currently serves as Chairman of the Board.

31. The 2024 Proxy Statement states the following about Defendant Bennett:

> Mr. Bennett has served as President of U.S. Onshore Resources and Carbon Management, Commercial Development of Occidental, the parent of OXY, since October 2020. In this role, Mr. Bennett is responsible for the strategic direction and capital placement for Occidental's U.S. Onshore Resources and Carbon Management business. He also served as Senior Vice President of Permian Resources of Occidental Oil and Gas, a subsidiary of Occidental, from April 2018 to April 2020 and as President and General Manager of Permian Resources and the Rockies from April 2020 to October 2020. Mr. Bennett previously served as President and General Manager — Permian Resources, New Mexico Delaware Basin, from January 2017 to April 2018, Chief Transformation Officer from June 2016 to January 2017, Vice President, Portfolio and Optimization of Occidental Oil and Gas from February 2016 to June 2016 and, prior to that, pioneered innovative logistical and operational solutions as Vice President, Operations Portfolio and Integrated Planning of Occidental Oil and Gas from October 2015 to February 2016. Mr. Bennett has served as a member of the board of directors of Western Midstream Partners, LP (NYSE: WES) since August 2019 and as chairperson of such board since December 2021. Mr. Bennett received a B.A. in accounting from Louisiana State University and an MBA from Pepperdine University in California. He is also a Certified Public Accountant (inactive).

**Defendant Derham**

32. Defendant Derham has served as a Company director since June 2023 and also serves as a member of the Nominating & Corporate Governance Committee.

33. The 2024 Proxy Statement states the following about Defendant Derham:

> Mr. Derham served as the Chief Executive Officer of RONI from February 2022 until the Closing; prior to that, he served as RONI's Chief Financial Officer from February 2021 to February 2022. Mr. Derham is a Partner of Rice Investment Group. Mr. Derham was a director of Archaea Energy Inc. from September 2021 until December 2022 when Archaea Energy Inc. was acquired by BP Products North America Inc. Mr. Derham, as part of certain members of the Rice Investment Group, led the shareholder campaign in 2019 to revamp the strategic direction of EQT Corporation ("EQT") and elect a majority slate of director candidates to the board of EQT, the largest operator of natural gas production in the United States. Following the campaign, Mr. Derham served as interim Chief Financial Officer of EQT and subsequently served as a strategic advisor to the company. Mr. Derham

previously served as Vice President, Corporate Development and Finance of Rice Energy and Rice Midstream from January 2014 through November 2017. Through his various roles working alongside the Rice family, Mr. Derham has focused on evaluating, structuring and negotiating key acquisitions and execution of critical strategic initiatives to generate attractive risk adjusted returns for investors. Mr. Derham also has experience as a private equity investor, working as an associate at First Reserve and as an investment banker at Barclays Investment Bank.

**Defendant Forthuber**

34. Defendant Forthuber has served as a Company director since June 2023.

35. The 2024 Proxy Statement states the following about Defendant Forthuber:

Mr. Forthuber currently serves as President of Oxy Energy Services, LLC, a subsidiary of Occidental. In this role, Mr. Forthuber has global functional responsibility for midstream and marketing of crude oil, natural gas liquids, and natural gas. In addition, Mr. Forthuber has global functional responsibility for Health and Safety, Process Safety and Risk Engineering. Mr. Forthuber has more than 35 years of industry experience in oil and gas operations. He has held positions of increasing responsibility in engineering and project management since joining Occidental with the acquisition of Altura Energy in 2000. Most recently, he served as Vice President Worldwide Operations for Occidental Oil and Gas Corporation. Prior to joining Occidental, Mr. Forthuber served in engineering roles for Altura Energy and Exxon. He has been a Director for the Western Midstream Board of Directors since 2021 and is a member of the Environmental, Social, and Governance Committee. Mr. Forthuber holds a Bachelor of Science degree in Marine Engineering Systems from the United States Merchant Marine Academy and an Executive Scholar Certificate in Finance from the Kellogg School of Management at Northwestern University.

**Defendant Kelliher**

36. Defendant Kelliher has served as a Company director since June 2023 and also serves as Chairman of the Nominating & Corporate Governance Committee and as a member of the Compensation Committee.

37. The 2024 Proxy Statement states the following about Defendant Kelliher:

Mr. Kelliher is a former Executive Vice President-Federal Regulatory Affairs for NextEra Energy, Inc. ("NextEra") and former Chairman of the Federal Energy Regulatory Commission ("FERC"). Mr. Kelliher was responsible for developing and executing FERC regulatory strategy for NextEra and its principal subsidiaries, NextEra Energy Resources and Florida Power & Light Company, from 2009 to 2020. NextEra is the largest electricity company in the U.S., one of the few national

electricity companies, operating in every region and every organized market, and the most complex company regulated by FERC, with multiple business lines subject to FERC regulation. Previously, Mr. Kelliher served as FERC Chairman and Commissioner from 2005 to 2009. A hallmark of his chairmanship was efficient implementation of the EP Act 2005, the largest expansion in FERC regulatory authority since the 1930s. This law gave FERC a new mission to assure reliability of the interstate power grid, granted the agency strong enforcement authority for the first time and expanded FERC powers in other areas. Chairman Kelliher pursued a series of reforms to promote competitive wholesale power and natural gas markets, improve FERC economic regulation and strengthen the U.S. energy infrastructure. Mr. Kelliher has spent his entire professional career working on energy policy matters, serving in a variety of roles in both the public and private sectors. These include senior policy advisor to the U.S. Secretary of Energy, majority counsel to the U.S. House Commerce Committee and positions with private corporations, trade associations and law firms. Mr. Kelliher earned a Bachelor of Science degree from Georgetown University, School of Foreign Service, and a Juris Doctor degree, magna cum laude, from The American University Washington College of Law.

**Defendant Patel**

38. Defendant Patel served as CFO of the Company from May 2020 to May 1, 2025.

39. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Patel made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 11/22/24 | 150,000 | $12.65 | $1,897,200 |

Thus, in total, before the fraud was exposed, he sold 150,000 shares of Company stock on inside information, for which he received approximately $1,897,200 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Peterson**

40. Defendant Peterson has served as a Company director since June 2023 and also serves as a member of the Audit Committee and the Nominating & Corporate Governance Committee.

41. The 2024 Proxy Statement states the following about Defendant Peterson:

> From 2004 until her retirement in February 2022, Ms. Peterson held multiple executive positions at Constellation. From January 2015 to February 2022, she served as Senior Vice President of Strategy & Planning, in which position she led major transformations including the separation of Constellation from Exelon Corporation and the integration of acquired power plants. Previously at Exelon Generation, from March 2014 to January 2015, she served as Vice President of Strategy, from April 2010 to March 2014, she served as Vice President of Project Management, and from October 2004 to April 2010, she served as Vice President of Finance. Ms. Peterson does not currently hold any positions with Constellation. Prior to Constellation, Ms. Peterson held positions in engineering and operations for Duke Energy Corporation (NYSE: DUK), Wisconsin Energy Corporation and Westinghouse Electric Corporation. Ms. Peterson has served on the Board of the Northern Illinois Food Bank since 2016. Ms. Peterson earned a bachelor's degree in engineering from the University of Illinois and a master's of management from Northwestern University.

**<u>Defendant Pollack</u>**

42. Defendant Pollack has served as a Company director since June 2023 and also serves as a member of the Nominating & Corporate Governance Committee.

43. The 2024 Proxy Statement states the following about Defendant Pollack:

> Mr. Pollack currently serves as Deputy General Counsel, Commercial Development and Operations of Occidental. In this role, which he has held since April 2023, Mr. Pollack is responsible for the legal support for domestic and international mergers, acquisitions and other commercial transactions, and manages the legal teams supporting Occidental's operations in the Middle East, North Africa, South America and Gulf of Mexico as well as major projects. He has also served as Vice President, Legal of OXY since July 2022, pursuant to which he is responsible for the legal support for Occidental's low carbon ventures business, which seeks to leverage Occidental's legacy of carbon management expertise to develop carbon capture, utilization and storage ("CCUS") projects. Mr. Pollack joined Occidental in 2014 and has held multiple positions of increasing responsibility within Occidental's legal department, including most recently serving as Associate General Counsel of Occidental Petroleum from January 2022 to April 2023, prior to which he served as Assistant General Counsel, M&A and Strategic Transactions, from April 2019 to June 2022, as Managing Counsel, M&A and Strategic

Transactions, from April 2018 to March 2019, and as Senior Counsel, M&A and Projects, from December 2014 to March 2018. Before joining Occidental, Mr. Pollack was a senior corporate and securities lawyer at Dechert LLP where he represented public and private companies in domestic and cross-border mergers and acquisitions, capital market transactions, corporate governance and other legal matters across a wide range of industry sectors, such as energy, technology, advanced manufacturing and financial services. Mr. Pollack received a B.S.E. in systems engineering from the University of Pennsylvania and a J.D. from Syracuse University College of Law.

**Defendant Sung**

44. Defendant Sung has served as a Company director since June 2023.

45. The 2024 Proxy Statement states the following about Defendant Sung:

> Ms. Sung has served as a Senior Vice President of SK Inc. and SK SUPEX Council, which is the official management advisory body of SK Group ("SK Group"), since April 2006. Over the course of her career with SK Group, Ms. Sung has successfully established group-level strategies in the CCUS and clean energy sectors, led multiple business development projects and played a significant role in many of SK Group's major investments in the CCUS, clean power, and clean ammonia areas. Ms. Sung recently spearheaded SK Group's $100 million investment in 8 Rivers and has served as a member of 8 Rivers' board of directors since March 2022. Ms. Sung has led an investment and business development team scouting for opportunities in the energy transition sector to help SK Group accelerate its business expansion in that space. Ms. Sung holds a B.S. in Bio Engineering from Yonsei University.

**Defendant Veltmann**

46. Defendant Veltmann has served as a Company director since June 2023 and also serves as the Chairwoman of the Audit Committee and as a member of the Compensation Committee.

47. The 2024 Proxy Statement states the following about Defendant Veltmann:

> Ms. Veltmann is an executive with financial leadership of publicly-listed entities, private entrepreneurial companies and global auditing firms. Ms. Veltmann has served as a member of California Resources Corporation's (NYSE: CRC) Board of Directors and Audit Committee Chair since December 2021. Ms. Veltmann serves as Senior Advisor of ESG Lynk, a sustainability reporting company she founded and sold, and served as CEO from 2018 to 2023. From 2021 to its acquisition in 2022, she served as a director and chair of the Audit Committee for Structural Integrity Associates, a private engineering company that provides life cycle

engineering solutions. services to the nuclear, fossil, renewables and critical infrastructure sectors. From 2015 to 2018, she was Vice President and Chief Accounting Officer of Paragon Offshore Plc., an offshore drilling company. From 2010 to 2015, she worked in various roles including Corporate Controller and Vice President and Chief Accounting Officer at Geokinetics, Inc., formerly one of the world's largest independent land and seafloor geophysical companies. She also worked in various auditor capacities at KPMG LLP from 1995 to 2002 and before that at Arthur Andersen LLP from 1992 to 1995. Ms. Veltmann is a certified public accountant and holds the FSA Credential from the Sustainability Accounting Standards Board. She has a BBA degree in Accounting from the University of New Mexico and is an alumna of the Advanced Management Program at Harvard Business School.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48. By reason of their positions as officers, directors, and/or fiduciaries of NET Power and because of their ability to control the business and corporate affairs of NET Power, the Individual Defendants owed NET Power and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NET Power in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of NET Power and its shareholders so as to benefit all shareholders equally.

49. Each director and officer of the Company owes to NET Power and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50. The Individual Defendants, because of their positions of control and authority as directors and/or officers of NET Power, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51. To discharge their duties, the officers and directors of NET Power were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NET Power, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of NET Power's Board at all relevant times.

53. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54. To discharge their duties, the officers and directors of NET Power were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of NET Power were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, North Carolina, and the United States, and pursuant to NET Power's own Code of Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how NET Power conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of NET Power and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NET Power's operations would comply with all applicable laws and NET Power's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was

required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55. Each of the Individual Defendants further owed to NET Power and the shareholders the duty of loyalty requiring that each favor NET Power's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

56. At all times relevant hereto, the Individual Defendants were the agents of each other and of NET Power and were at all times acting within the course and scope of such agency.

57. Because of their advisory, executive, managerial, directorial, and controlling positions with NET Power, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

58. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NET Power.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

61. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of NET Power was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NET Power, and was at all times acting within the course and scope of such agency.

## **NET POWER'S CODE OF ETHICS**

64. NET Power's Code of Ethics states that it applies to "[a]ll directors, officers, and other employees [of the Company] . . ." The Code of Ethics states that the Board has adopted the code ". . . in order to deter wrongdoing and promote, *inter alia*, honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships[,]" as well as "full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the 'SEC') and in other public communications made by the Company[.]"

65. Under the heading "Honest and Ethical Conduct," the Code of Ethics states the following:

> The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.
>
> Each director, officer and other employee must act with integrity and observe the highest ethical standards of business conduct in their dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom they have contact in the course of performing their job.

66. Under the heading "Conflicts of Interest," the Code of Ethics states the following:

> A conflict of interest occurs when an individual's private interest interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when a director, officer or other employee takes actions or has interests that may make it difficult to perform their work for the Company objectively and effectively. Conflicts of interest also arise when a director, officer or other employee (or a member of their family) receives improper personal benefits as a result of their position in the Company. Conflicts of interests include: (i) using Company property or information, or position within the Company, for personal gain or in a manner that competes with, disadvantages or diverts business opportunities away from the Company; (ii) owning a material interest in a business that does or seeks to do business with, or is in competition with, the Company,

> without prior authorization from the Company; (iii) working for, or receiving payments for services from, any business that either does or seeks to do business with the Company or is in competition with the Company, without prior authorization from the Company; (iv) engaging in work outside of the Company (including self-employment) if there is a risk that such outside employment may cause disclosure of confidential information of the Company; and (v) receiving preferential treatment (e.g., discounts, additional services/benefits, etc.) from the Company's business partners not available to the public, without prior authorization from the Company.
>
> Loans by the Company to, or guarantees by the Company of, obligations of directors, officers, other employees or their family members are of special concern. Loans by the Company to, or guarantees by the Company of, obligations of any director or executive officer are expressly prohibited.
>
> Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided unless specifically authorized as described in the following two paragraphs.
>
> Persons other than directors and executive officers who have questions about a potential conflict of interest or who become aware of an actual or potential conflict should discuss the matter with, and seek a determination and prior authorization from, their supervisor or the Company's General Counsel. A supervisor may not authorize conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first providing the Company's General Counsel with a written description of the activity and seeking the Company's General Counsel's written authorization. If the supervisor is involved in the potential or actual conflict, the matter should instead be discussed directly with the Company's General Counsel.
>
> Directors and executive officers must seek determinations and prior authorizations of potential conflicts of interest exclusively from either the Board's Audit Committee (the "Audit Committee") or the Company's General Counsel.

67. Under the heading "Corporate Opportunities," the Code of Ethics states the following:

> All directors, officers and other employees owe a duty to the Company to advance its interests when the opportunity to do so arises. Directors, officers and other employees are prohibited from taking for themselves personally opportunities that are discovered through the use of Company property, information or position. Directors, officers and other employees may not use Company property, information or position for personal gain. In addition, no director, officer or other employee may compete with the Company.

68. Under the heading "Compliance," the Code of Ethics states the following:

> Directors, officers and other employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates.
>
> Although not all directors, officers and other employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Company's General Counsel.
>
> Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy

69. Under the heading "Disclosure," the Code of Ethics states the following:

> The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.
>
> Each director, officer and other employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and other employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.
>
> Each director, officer and other employee who is involved in the Company's disclosure process must:
>
> 1. be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and
>
> 2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

70. Under the heading "Reporting and Investigation of Violations," the Code of Ethics states the following:

> Actions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee. Actions prohibited by this Code involving anyone other than a director or executive officer must be reported to the reporting person's supervisor or the Company's General Counsel.
>
> After receiving a report of an alleged prohibited action, the Audit Committee, the supervisor or the Company's General Counsel, as applicable, must promptly take all appropriate actions necessary to investigate.

> All directors, officers and other employees are expected to cooperate in any internal investigation of misconduct.

71. Under the heading "Enforcement," the Code of Ethics states the following:

> The Company must ensure prompt and consistent action against violations of this Code.
>
> If, after investigating a report of an alleged prohibited action by a director or executive officer, the Audit Committee determines that a violation of this Code has occurred, the Audit Committee will report such determination to the Board. If, after investigating a report of an alleged prohibited action by any other person, the relevant supervisor determines that a violation of this Code has occurred, the supervisor will report such determination to the Company's General Counsel.
>
> Upon receipt of a determination that there has been a violation of this Code, the Board or the Company's General Counsel will take such preventative or disciplinary action as the Board or the General Counsel deems appropriate, including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities.

72. Under the heading "Waivers," the Code of Ethics states the following:

> The Board (in the case of a violation by a director or executive officer) or the Company's General Counsel (in the case of a violation by any other person) may, in its discretion, waive any violation of this Code. Any waiver for a director or an executive officer shall be disclosed if and as required by SEC and New York Stock Exchange rules.

73. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## **NET POWER'S AUDIT COMMITTEE CHARTER**

74. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to:

> . . . assist the Board with oversight of . . . the integrity of the Company's financial statements, . . . the Company's compliance with legal and regulatory requirements, . . . the Company's independent auditor's qualifications and independence, . . . the performance of the Company's independent auditor and internal audit function, and . . . the Company's system of disclosure controls and procedures and internal control structure over financial reporting.

75. The Audit Committee Charter lists the following responsibilities of the Audit Committee, in relevant part:

> 7. **Internal Controls**: To review with management, internal audit and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's Annual Report on Form 10-K or Quarterly Report on Form 10-Q, as applicable.
>
> 8. **Risk Oversight**: To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.
>
> 9. **Annual Financials**: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Annual Report on Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

10. **Quarterly Financials**: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Quarterly Report on Form 10-Q before the Form 10-Q is filed.

11. **Earnings Releases**: To review and discuss with management and the Company's independent auditor (a) the Company's earnings releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other nonGAAP financial information and (b) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), and each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

12. **Financial Statements Issues**: To review with management and the Company's independent auditor (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, (b) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements, (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements, (d) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles and (e) the completeness and clarity of the disclosures in the financial statements.

****

15. **Quality Control/Independence Report**: At least annually, to obtain and review a report by the Company's independent auditor that describes (a) the independent auditor's internal quality control procedures, (b) any material issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the independent auditor and any steps taken to deal with any such issues and (c) all relationships between the independent auditor and the Company or any of its subsidiaries in order to assess the independent auditor's independence.

****

20. **Code of Ethics**: To monitor compliance with the Company's Code of Ethics (the "Code"), to investigate any alleged breach or violation of the Code and to enforce the provisions of the Code.

21. **Related Party Transactions**: To review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) on an ongoing basis, in accordance with Company policies and procedures; to keep the Company's independent auditor informed of the Audit Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company and whether the Audit Committee has concerns regarding relationships or transactions with related persons and, if so, the substance of those concerns; and to review and discuss with the Company's independent auditor the independent auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

22. **Legal Compliance**: To review, with the Company's General Counsel and outside legal counsel, legal and regulatory matters relating to the Company and its subsidiaries that could have a significant impact on the Company's financial statements; to review the Company's compliance with applicable laws and regulations; and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance and sustainability.

23. **Whistleblowers**: To establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

76. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77. NET Power originated as a Cayman Islands special purpose acquisition company ("SPAC")[1], known as Rice Acquisition Corp. II.

78. On December 14, 2022, the Company and NET Power, LLC ("Legacy NET Power") jointly announced their entrance into a business combination agreement (the "Merger Agreement") while the Company was still functioning as a SPAC.

79. The terms of the Merger Agreement were for the Company to redomicile in Delaware and change its name to "NET Power Inc." The Merger Agreement further stipulated that, *inter alia*, the Company's wholly owned subsidiary would merge with and into Legacy Net Power. Under the terms of the Merger Agreement, Legacy NET Power would survive the merger as a direct, wholly owned subsidiary of the Company (the "Merger").

80. On December 23, 2022, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger. On May 10, 2023, the SEC declared the registration statement effective following several amendments.

81. Also on May 10, 2023, the Company fled a proxy statement/prospectus on Form 424B3 with the SEC in connection with the Merger (the "Proxy" and, together with the Registration Statement, the "Offering Documents").

82. On June 8, 2023, the Company and Legacy NET Power completed the merger and began to operate in the U.S. under the name "NET Power Inc." On June 9, 2023, the Company's securities began trading publicly on the NYSE.

---

[1] A SPAC, also called a blank-check company, is a development stage company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies or other entity.

83. NET Power's chief product is the NET Power Cycle which purportedly generates electricity through natural gas and simultaneously captures nearly all atmospheric emissions.

84. The NET Power Cycle involves two main technologies: Oxy-combustion ("a clean heat generation process in which fuel is mixed with oxygen such that the resulting byproducts from combustion consist of only water and pure CO2") and Supercritical CO2 power cycle ("a closed or semi-closed loop process that replaces the air or steam used in most power cycles with recirculating CO2 at high pressure, as sCO2, producing power by expanding sCO2 continuously through a turbo expander").

85. The Company operates a "Demonstration Plant" to test and refine the capabilities of the NET Power Cycle. The Demonstration Plant is located in La Porte, Texas.

86. Among NET Power's most notable current projects is the Company's first utility-scale plant known as "SN1" or "Project Permian." Project Permian is situated in the Permian Basin of West Texas.

87. Prior to and following the Merger, Defendants intimated that Project Permian would be operational in 2026. Given that NET Power's commercial operations and thus its financial prospects relied upon the completion of Project Permian, the project's cost estimate and timeline are significant factors for investors and analysts.

**<u>False and Misleading Statements</u>**

***June 9, 2023 Offering Documents***

88. On June 9, 2023, the Company's post-Merger securities began trading on the NYSE. The Company's offering documents in connection with its initial public offering ("IPO") ("Offering Documents") stated that "[w]e anticipate our first utility-scale plant [i.e., SN1] to be operational in 2026[.]" The Offering Documents went on to assure investors that Project Permian

would follow a similar path as the proven path utilized to complete the Demonstration Plant. In relevant part, the Offering Documents stated:

> Major remaining development activities relating to an operational utility-scale plant by 2026 are similar to the activities we have previously undertook to design, build and commission the La Porte, Texas demonstration facility. They include, but are not limited to: finalizing a Siting Study, initiating all permitting required, conducting a Front End Engineering Design (FEED) study, originating all required supply and off-take contracts, structuring the project to attract any required 3rd party equity and debt financing and achieving final investment decision (FID), initiating the Engineer, Procurement and Construction (EPC) process, and constructing and commissioning the facility.

***August 14, 2023 Press Release***

89. On August 14, 2023, the Company issued a press release regarding its financial results for the second quarter of 2023 and providing a business update (the "Q2 2023 Press Release"). The Q2 2023 Press Release noted that the Company "is making significant progress in developing [its] first Texas-based project, now called Project Permian (formerly SN1)[.]"

90. The Q2 2023 Press Release further stated that "[i]n the second quarter of 2023, NET Power accelerated site origination work" and was "finalizing Project Permian's CO2 transportation and sequestration plan that leverages Oxy's [OLCV Net Power, LLC] existing CO2 infrastructure with no new sequestration permits expected to be needed."

***August 14, 2023 Earnings Call***

91. Also on August 14, 2023, the Company hosted an Earnings Call regarding its financial results for the second quarter of 2023. During the call, Defendant Rice conveyed that "[o]ur current estimate [for Project Permian] is roughly $950 million[.]"

***August 14, 2023 Form 10-Q***

92. Also on August 14, 2023, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial and operational results for the second quarter of 2023 (the "Q2 2023 10-Q"). The Q2 2023 10-Q noted, in relevant part:[2]

> We believe that our performance and future success depend on a number of factors that present significant opportunities for us but also pose risks and challenges, including, but not limited to . . . ***potential*** supply chain issues . . . . ***Potential*** supply chain issues related to the manufacturing and transportation of key equipment ***have not yet had a material impact on our results of operations or capital resources***, but continued material disruption in the supply chain ***may, in the future***, lead to a delay in our commercialization efforts, which could impact our results of operations.

Notably, the Q2 2023 10-Q's mention of risk concerning supply chain issues was speculative and generalized and failed to target either Defendants' actual knowledge of risk concerning supply chain issues or the actual impact such supply chain issues were having on Project Permian's timeline.

93. The Q2 2023 10-Q also stated that "the Company plans to . . . construct its first utility-scale plant [SN1] with targeted completion in 2026[,]" which "will be . . . located at . . . the Permian Basin of West Texas[,]" and intimated that SN1's development would follow a similarly predictable path as the Company's Demonstration Plant.

94. The Q2 2023 10-Q was further appended by signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), in which Defendants Rice and Patel certified that the Q2 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all

---

[2] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

material respects the financial condition, results of operations and cash flows of [Net Power] as of, and for, the periods presented in this report[.]"

95. The statements in ¶¶ 88-94 were materially false and misleading because they statements that failed to disclose, *inter alia*, that: (1) the Company was unlikely to complete Project Permian on the timetable relayed to investors; (2) Project Permian would require substantially increased costs; (3) the timeline and estimated costs which the Company relayed to investors was unrealistic; and (4) the delays and further costs to Project Permian would result in substantial harm to the Company's financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH BEGINS TO EMERGE AS THE FALSE AND MISLEADING STATEMENTS CONTINUE**

***November 14, 2023 Press Release***

96. On November 14, 2023, during pre-market hours, the Company issued a press release regarding its financial results for the third quarter of 2023 and providing a business update (the "Q3 2023 Press Release"). The Q3 2023 Press Release stated that "[d]ue to . . . tightness in the global supply chain, we are incorporating a 12-month cushion into our expected schedule for Project Permian" with the Company "now expecting to achieve initial power generation sometime between the second half of 2027 and first half of 2028." This update provided a substantial delay to the Company's initial representation of commercial operations by 2026.

97. On this news, the price per share of the Company's common stock fell $2.47, or 18.54%, from a closing price of $13.32 per share on November 13, 2023 to close at $10.85 per share on November 14, 2023.

98. Despite this partial emergence of the truth, Defendants continued to mislead investors regarding, among other things, the ultimate timeline and cost estimate for Project Permian. For instance, the Q3 2023 Press Release stated that the Company's "supply chain strategy is intended to alleviate these market constraints," while also representing that Defendants would "prudently incorporate the current supply chain challenges into [their] project timing and planning."

99. Further, the Q3 2023 Press Release stated that the Company had "completed the initial survey and environmental assessment of the plant site" for Project Permian.

***November 14, 2023 Form 10-Q***

100. Also on November 14, 2023, the Company filed its quarterly report on Form 10-Q with the SEC to report the Company's financial and operational results for the third quarter of 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q stated that the Company "target[ed] initial [SN1] power generation between the second half of 2027 and the first half of 2028[,]" and that SN1 would follow a similar path as the proven path utilized to complete the Demonstration Plant.

101. The Q3 2023 10-Q further presented the same speculative and generalized mention of risk concerning supply chain issues as referenced in ¶ 92, *supra*. Likewise, the Q3 2023 10-Q was appended by the substantively similar SOX certifications as referenced in ¶ 94, *supra*, signed by Defendants Rice and Patel.

***March 11, 2024 Press Release***

102. On March 11, 2024, the Company issued a press release regarding its fourth quarter and full year financial results for 2023 and providing a business update. Among other things, the press release stated that "[i]n the first quarter of 2024, the Company initiated engineering work with the Company's selected ASU [Air Separation Unit] provider for Project Permian and executed

a site land lease agreement with Occidental Petroleum[,]" which supposedly "***position[ed] NET Power to remain on target with the Project Permian development schedule***."

***March 11, 2024 Investor Presentation***

103. Also on March 11, 2024, the Company hosted a presentation for investors. During the presentation, the Company conveyed, in relevant part, that "Project Permian initial power generation [remained] on track for 2H [second half of] 2027 / 1H [first half of] 2028[.]"

***March 11, 2024 Form 10-K***

104. Also on March 11, 2024, the Company filed its annual report on Form 10-K with the SEC to report its financial and operational results for 2023 (the "2023 10-K"), which contained false and misleading statements and was signed by Defendants Rice, Patel, Bennett, Alexander, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann. The 2023 10-K represented that NET Power faced potential risks related to "[m]anufacturing and construction issues not identified prior to design finalization, long-lead procurement and/or module fabrication [that] ***could*** potentially be realized during production, fabrication or construction and ***may*** impact plant deployment cost and schedule," which "***could*** adversely impact our business[.]"

105. The 2023 10-K further stated, in relevant part:

> The NET Power Cycle design ***will be actively managed through design reviews, prototyping, involvement of external partners and application of industry lessons***, but we ***could*** still fail to identify latent manufacturing and construction issues early enough to avoid negative effects on production, fabrication, construction or ultimate performance of our technology, licenses or plants. Where these issues arise at such later stages of deployment, plant deployment ***could*** be subject to greater costs or be significantly delayed, and such delay ***could*** materially and adversely affect our business.

Notably, the 2023 Form 10-K's mention of risk concerning supply chain issues was speculative and generalized and not targeting either Defendants' actual knowledge of risk concerning supply chain issues or the actual impact such supply chain issues were having on Project Permian's

timeline and cost estimate. The insufficiency of the 2023 Form 10-K's mention of risk is underlined by the Company's representation in ¶ 99, *supra* that the initial survey and environmental assessment for Project Permian's plant site had already been completed.

106. In addition, the 2023 10-K contained the same statements referenced in ¶ 96, *supra* conveying an expectation of initial power generation from Project Permian between the second half of 2027 and the first half of 2028. The 2023 10-K was appended by substantively similar SOX certifications as referenced in ¶ 94, *supra,* signed by Defendants Rice and Patel.

***April 26, 2024 Proxy Statement***

107. On April 26, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Rice, Alexander, Bennett, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann solicited the 2024 Proxy Statement, which contained materially false and misleading statements, pursuant to Section 14A of the Exchange Act.

108. The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Alexander, Forthuber, Peterson, and Sung to serve on the Board until 2027; and (2) ratify the appointment of Grant Thornton LLP as NET Power's independent auditors for the fiscal year ending December 31, 2024.

109. Regarding "Board Leadership," the 2024 Proxy Statement stated the following:

> The roles of Chairman of the Board and Chief Executive Officer are currently separated. Mr. Bennett serves as Chairman of the Board and Mr. Rice serves as our Chief Executive Officer. We believe that separating these positions allows Mr. Rice to focus on our day-to-day business and operations and allows Mr. Bennett to focus his energies on the Company's strategic initiatives and leading the Board in its fundamental role of providing advice to and oversight of management.

110. Regarding "Risk Oversight," the 2024 Proxy Statement stated the following:

> As part of regular Board and committee meetings, the directors oversee executives' management of risks relevant to the Company. While the full Board has overall responsibility for risk oversight, the Board has delegated responsibility related to certain risks to various committees. In particular, the Audit Committee has the

> responsibility to review and discuss our major financial risk exposures and cybersecurity risks and the steps our management will take to monitor and control such exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our Audit Committee also monitors compliance with legal and regulatory requirements. Our Compensation Committee assesses and monitors whether our compensation plans, policies and programs comply with applicable legal and regulatory requirements. The full Board regularly reviews reports from management on various aspects of our business, including related risks and tactics and strategies for addressing them.

111. Regarding the Code of Ethics, the 2024 Proxy Statement stated the following:

> We have a code of ethics that applies to all of our executive officers, directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The code of ethics is available on our corporate website at https://ir.netpower.com/governance/leadership. Any required disclosures regarding amendments to, or waivers of, provisions of our code of ethics will be disclosed on our website at https://ir.netpower.com/governance/leadership.

112. Defendants Rice, Alexander, Bennett, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was unlikely to complete Project Permian on the timetable relayed to investors; (2) Project Permian would require substantially increased costs; (3) the timeline and estimated costs which the Company relayed to investors was unrealistic; and (4) the delays and further costs to Project Permian would result in substantial harm to the Company's financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

113. The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2023 Proxy Statement was materially false and misleading because,

despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

114. As a result of Defendants Rice, Alexander, Bennett, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann causing the 2024 Proxy Statement to be false and misleading, the Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Alexander, Forthuber, Peterson, and Sung to serve on the Board until 2027; and (2) ratify the appointment of Grant Thornton LLP as our independent auditors for the fiscal year ending December 31, 2024.

***May 13, 2024 Press Release***

115. On May 13, 2024, the Company issued a press release regarding its financial results for the first quarter of 2024 and providing a business update (the "Q1 2024 Press Release"). Among other things, the Q1 2024 Press Release conveyed that "[d]uring the quarter, engineering work began with the Company's selected [ASU] provider for Project Permian, and a site land lease agreement was executed with Occidental Petroleum[,]" which purportedly "***position[ed] NET Power to remain on target with the Project Permian development schedule with a first fire between second half of 2027 and first half of 2028***."

***May 13, 2024 Earnings Call***

116. Also on May 13, 2024, the Company hosted an earnings call regarding its financial results for the first quarter of 2024. During the call, Defendant Allen stated that Project Permian "remains on schedule with initial power generation expected to occur between the second half of 2027 and first half of 2028."

***May 13, 2024 Form 10-Q***

117. Also on May 13, 2024, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial and operational results for the first quarter of 2024 (the "Q1 2024

10-Q"). The Q1 2024 10-Q contained the same statements conveying the Company's target completion date for Project Permian of between the second half of 2027 and the first half of 2028 as referenced in ¶ 96, *supra*.

118. The Q1 2024 10-Q likewise contained substantively similar generalized risk warnings concerning potential supply chain issues as referenced in ¶ 92, *supra*. Additionally, the Q1 2024 10-Q was appended by substantively similar SOX certifications as referenced in ¶ 94, *supra*, signed by Defendants Rice and Patel.

***August 12, 2024 Press Release***

119. On August 12, 2024, the Company issued a press release regarding its financial results for the second quarter of 2024 (the "Q2 2024 Press Release"). The press release stated, in relevant part, that "[i]nitial power generation for Project Permian remains on schedule to occur between the second half of 2027 and first half of 2028."

***August 12, 2024 Form 10-Q***

120. Also on August 12, 2024, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial and operational results for the second quarter of 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q contained the same statements conveying the Company's target completion date for Project Permian of between the second half of 2027 and the first half of 2028 as referenced in ¶ 96, *supra*.

121. The Q2 2024 10-Q likewise contained substantively similar generalized risk warnings concerning potential supply chain issues as referenced in ¶ 92, *supra*. Additionally, the Q2 2024 10-Q was appended by substantively similar SOX certifications as referenced in ¶ 94, *supra*, signed by Defendants Rice and Patel.

***August 13, 2024 Earnings Call***

122. On August 13, 2024, the Company hosted an earnings call (the "August 13, 2024 Earnings Call") regarding its financial results for the second quarter of 2024. During the call, an analyst asked Defendants whether "as you look at the overall timeline in the next year or two [for Project Permian], do you not see any change?" Defendant Allen replied, in relevant part, stating "yeah, no change in schedule, no slip of any sort."

123. Later during the August 13, 2024 Earnings Call, Defendant Rice stated, in relevant part:

> [J]ust a reminder for everybody, the goal was originally, look, let's build a shadow backlog of 30 to 40 NET Power projects that we kind of have teed up, going through the requisite grid and subsurface permits for the first 30 to 40 plants ***by the time the first one comes online at the end of 2027***. And then that'll really be the thing that catalyzes us into manufacturing mode and allows us to come down that Capex [capital expenditure] curve. You know, ***we can take our Capex from $1 billion, $1.1 billion, down towards that $700 million*** that we're targeting long term.

***November 11, 2024 Press Release***

124. On November 11, 2024, the Company issued a press release regarding its financial results for the third quarter of 2024 and providing a business update (the "Q3 2024 Press Release"). The Q3 2024 Press Release quoted Defendant Rice as stating, in relevant part, that that "[w]e continue to make steady progress on all fronts to commercialize our clean, firm power solution[,]" and that "[o]ur first utility-scale plant deployment is on schedule[.]"

125. The Q3 2024 Press Release further conveyed that Project Permian "remains on schedule with initial power generation expected to occur between the second half of 2027 and first half of 2028."

***November 12, 2024 Form 10-Q***

126. On November 12, 2024, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial and operational results for the third quarter of 2023 (the "Q3 2024 10-Q"). The Q3 2024 10-Q contained the same statements conveying the Company's target

completion date for Project Permian of between the second half of 2027 and the first half of 2028 as referenced in ¶ 96, *supra*.

127. The Q3 2024 10-Q likewise contained substantively similar generalized risk warnings concerning potential supply chain issues as referenced in ¶ 92, *supra*. Additionally, the Q3 2024 10-Q was appended by substantively similar SOX certifications as referenced in ¶ 94, *supra*, signed by Defendants Rice and Patel.

***November 12, 2024 Earnings Call***

128. Also on November 12, 2024, the Company hosted an earnings call regarding its financial results for the third quarter of 2023. During the call, Defendant Patel discussed Defendants' anticipated increases to Project Permian's cost estimate. However, at the same time Defendant Patel toned down the scale of such cost estimate increases, stating, in relevant part:

> Similar to other market participants, we expect to see continued inflation in capital equipment and construction costs compared to our previously provided guidance of $1.1 billion for Project Permian. Importantly, we also expect this inflation will be offset by the continued improvement in the market price for clean, reliable power.

129. The statements in ¶¶ 88-106 and ¶¶ 115-128 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company was unlikely to complete Project Permian on the timetable relayed to investors; (2) Project Permian would require substantially increased costs; (3) the timeline and estimated costs which the Company relayed to investors was unrealistic; and (4) the delays and further costs to Project Permian would result in substantial harm to the Company's financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

130. The truth finally emerged on March 10, 2025, during pre-market hours, when the Company issued a press release regarding its financial results for the fourth quarter and full year of 2024 and providing a business update (the "Q4/FY 2024 Press Release"). The Q4/FY 2024 Press Release stated that "Net Power [had] finalized the Front-End Engineering and Design (FEED) for Project Permian," and that "***[t]he cost estimate was significantly higher than expected[.]***"

131. Notably, the Q4/FY 2024 Press Release observed that the Defendants' timeline and cost estimate for Project Permian had substantially increased due to, *inter alia*, supply chain issues and multiple site- and region-specific challenges. The Q4/FY 2024 Press Release stated, in relevant part:

> A decade of underinvestment in power infrastructure combined with unprecedented load growth on the horizon has triggered a significant response to add firm generation capacity in the U.S., with unabated natural gas emerging as the only deployable source today. ***This surge in demand has caused broader inflationary and supply chain pressures across the generation sector, affecting SN1 cost estimates that exceed viable economic thresholds.*** In response, Net Power has commenced a post-FEED optimization and value engineering process. Net Power now estimates Project Permian's total installed cost to be between $1.7 billion and $2.0 billion, which is inclusive of non-recurring first-of-a-kind, Project Permian site-specific and owner costs. While Project Permian benefits from existing CO2 pipeline infrastructure, there are a number of site- and region-specific challenges which impact cost. Long lead equipment releases have been suspended but value engineering and certain development work remain in progress. Provided the successful value engineering process, the project would come online no earlier than 2029.

132. On this news, the price per share of the Company's stock fell $2.18 per share, or approximately 31.46%, from a close of $6.93 per share on March 7, 2025 to close at $4.75 per share on March 10, 2025.

## <u>POST-RELEVANT PERIOD DEVELOPMENTS</u>

133. On April 15, 2025, the Company issued a press release noting the departure of CFO Patel and COO/President Allen as of May 1, 2025, and that "[t]he Company has appointed Marc Horstman as [COO], effective immediately."

134. On this news, the price of the Company's stock fell $0.13 per share, or 5.75%, from a close of $2.26 per share on April 15, 2025 to close at $2.13 per share on April 16, 2025.

## DAMAGES TO NET POWER

135. As a direct and proximate result of the Individual Defendants' conduct, NET Power will lose and expend many millions of dollars.

136. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its CEO; its former CFO; and its former President and COO and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

137. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

138. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

139. Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, as well as proceeds obtained through improper lucrative insider trading conducted by one of the Individual Defendants.

140. As a direct and proximate result of the Individual Defendants' conduct, NET Power has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

141. Plaintiff brings this action derivatively and for the benefit of NET Power to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of NET Power, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

142. NET Power is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

143. Plaintiff is, and has been at all relevant times, a shareholder of NET Power. Plaintiff will adequately and fairly represent the interests of NET Power in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

144. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, NET Power's Board consisted of the following ten individuals: Defendants Rice, Alexander, Bennett, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director-Defendants that were on the Board at the time this action was filed.

146. Demand is excused as to all of the Director-Defendants because each of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

147. The Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Alexander, Forthuber, Peterson, and Sung to the Board, thus allowing them to continue breaching their fiduciary duties to NET Power. For these reasons, too, demand upon the Director-Defendants is futile, and thus excused.

148. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted NET Power to issue materially false and misleading statements. Specifically, the Director-Defendants caused NET Power to issue false and misleading statements which indicated Project Permian would be operational on the timeline and at the cost estimate conveyed to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

149. Additional reasons that demand on Defendant Rice is futile to follow. Defendant Rice has served as the Company's CEO and as a Company director since June 2023. The Company provides Defendant Rice with his principal occupation, for which he receives handsome compensation for his role at the Company. Thus, as the Company admits, Defendant Rice is not

an independent director. As the trusted CEO, Defendant Rice conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. As CEO, Defendant Rice also personally signed all of the false and misleading 10-Qs and 10-Ks during the Relevant Period. Defendant Rice also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter* alia, to re-elect Defendants Alexander, Forthuber, Peterson, and Sung to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. He is also a defendant in the Securities Class Action. For these reasons, Defendant Rice faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150. Additional reasons that demand on Defendant Alexander is futile follow. Defendant Alexander has served as a Company director since June 2023. He also serves as a Chairman of the Compensation Committee and as a member of the Audit Committee. Defendant Alexander has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Alexander also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Alexander also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter*

*alia*, to re-elect Defendants Forthuber, Peterson, Sung, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Alexander breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151. Additional reasons that demand on Defendant Bennett is futile follow. Defendant Bennett has served as a Company director since June 2023. He also serves as Chairman of the Board. Defendant Bennett has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Bennett also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Bennett also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Alexander, Forthuber, Peterson, and Sung to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Bennett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152. Additional reasons that demand on Defendant Derham is futile follow. Defendant Derham has served as a Company director since June 2023. He also serves as a member of the Nominating & Corporate Governance Committee. Defendant Derham has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor

such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Derham also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Derham also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Alexander, Forthuber, Peterson, and Sung to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Derham breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Forthuber is futile follow. Defendant Forthuber has served as a Company director since June 2023. Defendant Forthuber has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Forthuber also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Forthuber also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Alexander, Peterson, Sung, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Forthuber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154. Additional reasons that demand on Defendant Kelliher is futile follow. Defendant Kelliher has served as a Company director since June 2023. He also serves as Chairman of the

Nominating & Corporate Governance Committee and as a member of the Compensation Committee. Defendant Kelliher has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Kelliher also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Kelliher also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Alexander, Forthuber, Peterson, and Sung to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Kelliher breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155. Additional reasons that demand on Defendant Peterson is futile follow. Defendant Peterson has served as a Company director since June 2023. She also serves as a member of the Audit Committee and as a member of the Nominating & Corporate Governance Committee. Defendant Peterson has received and continues to receive handsome compensation for her role as a Company director. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a director, Defendant Peterson also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Peterson also solicited the false and misleading 2024 Proxy Statement, which led to

shareholders voting, *inter alia*, to re-elect Defendants Alexander, Forthuber, Sung, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Peterson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156. Additional reasons that demand on Defendant Pollack is futile follow. Defendant Pollack has served as a Company director since June 2023. He also serves as a member of the Nominating & Corporate Governance Committee. Defendant Pollack has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Pollack also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Pollack also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Alexander, Forthuber, Peterson, and Sung to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Pollack breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157. Additional reasons that demand on Defendant Sung is futile follow. Defendant Sung has served as a Company director since June 2023. Defendant Sung has received and continues to receive handsome compensation for her role as a Company director. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the

scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a director, Defendant Sung also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Sung also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Alexander, Forthuber, Peterson, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Sung breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Veltmann is futile follow. Defendant Veltmann has served as a Company director since June 2023. She also serves as Chairwoman of the Audit Committee and as a member of the Compensation Committee. Defendant Veltmann has received and continues to receive handsome compensation for her role as a Company director. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a director, Defendant Veltmann also personally signed the false and misleading 2023 and 2024 10-Ks. Defendant Veltmann also solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Alexander, Forthuber, Peterson, and Sung to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Veltmann breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159. Additional reasons that demand on the Board is futile follow.

160. Defendants Veltmann (as Chair), Alexander, and Peterson (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

161. In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

162. NET Power has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for NET Power any part of the damages NET Power suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

163. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

164. The acts complained of herein constitute violations of fiduciary duties owed by NET Power's officers and directors, and these acts are incapable of ratification.

165. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of NET Power. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of NET Power, there would

be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

166. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause NET Power to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

167. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
## Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

1. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

2. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

3. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

4. Under the direction and watch of Defendants Rice, Alexander, Bennett, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

5. The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was unlikely to complete Project Permian on the timetable relayed to investors; (2) Project Permian would require substantially increased costs; (3) the timeline and estimated costs which the Company relayed to investors was unrealistic; and (4) the delays and further costs to Project Permian would result in substantial harm to the Company's financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

6. In exercise of reasonable care, Defendants Rice, Alexander, Bennett, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions

were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the re-election of Defendants Alexander, Forthuber, Peterson, and Sung to the Board.

7. The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Alexander, Forthuber, Peterson, and Sung to the Board for a three-year term, which allowed them to continue to breach their fiduciary duties to the Company.

8. The Company was damaged as a result of Defendants Rice, Alexander, Bennett, Derham, Forthuber, Kelliher, Peterson, Pollack, Sung, and Veltmann's material misrepresentations and omissions in the 2024 Proxy Statement.

9. Plaintiff, on behalf of NET Power, has no adequate remedy at law.

## SECOND CLAIM

## Against the Individual Defendants for Breach of Fiduciary Duties

10. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

11. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of NET Power's business and affairs.

12. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

13. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of NET Power.

14. In breach of their fiduciary duties owed to NET Power, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements

and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was unlikely to complete Project Permian on the timetable relayed to investors; (2) Project Permian would require substantially increased costs; (3) the timeline and estimated costs which the Company relayed to investors was unrealistic; and (4) the delays and further costs to Project Permian would result in substantial harm to the Company's financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

16. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

17. In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendants engaged in lucrative insider sales while the Company's stock price was artificially inflated before the fraud was exposed, netting total proceeds of approximately $1,897,200.

18. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even

though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

19. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

20. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, NET Power has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

21. Plaintiff, on behalf of NET Power, has no adequate remedy at law.

## THIRD CLAIM
## Against the Individual Defendants for Unjust Enrichment

22. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

23. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NET Power.

24. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from NET Power that was tied to the performance or artificially inflated valuation of NET Power, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

25. Plaintiff, as a shareholder and representative of NET Power, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and

other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

26. Plaintiff, on behalf of NET Power, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

27. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

28. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence NET Power, for which they are legally responsible.

29. As a direct and proximate result of the Individual Defendants' abuse of control, NET Power has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

30. Plaintiff, on behalf of NET Power, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

31. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

32. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of NET Power in a manner consistent with the operations of a publicly held corporation.

33. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, NET Power has sustained and will continue to sustain significant damages.

34. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

35. Plaintiff, on behalf of NET Power, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

36. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

37. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

38. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

39. Plaintiff, on behalf of NET Power, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Rice, Allen, and Patel for Contribution Under Sections 10(b) and 21D of the Exchange Act

40. Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

41. NET Power and Defendants Rice, Allen, and Patel are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Rice's,

Allen's, and Patel's willful and/or reckless violations of their obligations as officers, directors, and/or fiduciaries of NET Power.

42. Defendants Rice, Allen, and Patel, because of their positions of control and authority as officers, directors, and/or fiduciaries of NET Power, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of NET Power, including the wrongful acts complained of herein and in the Securities Class Action.

43. Accordingly, Defendants Rice, Allen, and Patel are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

44. As such, NET Power is entitled to receive all appropriate contribution or indemnification from Defendants Rice, Allen, and Patel.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of NET Power, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to NET Power;

(c) Determining and awarding to NET Power the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing NET Power and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect NET Power and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of NET Power to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding NET Power restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: May 29, 2025

Respectfully submitted,

**HAUSLER LAW FIRM, PLLC**

/s/ *Kurt F. Hausler*
Kurt F. Hausler
NC Bar No. 22103
524 East Boulevard
Charlotte, NC 28203
Telephone: (704) 247-3255
Fax: (704) 247-3267
Email: khausler@hauslerlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, Bryan Mott, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of May, 2025.

DocuSigned by:
Bryan Mott
AB0D082B9F964E2...

Bryan Mott